STEPHANIE M. HINDS (CABN 154284)
United States Attorney

THOMAS A. COLTHURST (CABN 99493)
Chief, Criminal Division

ALEXANDRA SHEPARD (CABN 205143)
RYAN REZAEI (CABN 285133)
Assistant United States Attorney

    450 Golden Gate Avenue, Box 36055
    San Francisco, California 94102-3495
    Telephone: (415) 436-7200
    FAX: (415) 436-7234
    alexandra.shepard@usdoj.gov
    ryan.rezaei@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. 3:22-mj-70740 MAG |
| Plaintiff, | UNITED STATES' DETENTION MOTION AND MEMORANDUM |
| v. | |
| BAYRON FLORES a/k/a "Jerson," | |
| Defendant. | |

## I.  INTRODUCTION

The United States requests that the Court detain the defendant Bayron Flores, a/k/a "Jerson," a professional poly-drug dealer who peddles fentanyl and methamphetamine in Oakland and San Francisco, as both a danger to the community and a serious risk of flight.

Flores has been dealing drugs since at least February 2022, when he was captured on recorded calls offering various colors of fentanyl to an undercover agent. In March 2022, Flores ended up selling to the undercover agent both methamphetamine and fentanyl during two controlled buys. At about the same time (in March 2022), Flores was repeatedly captured on a wiretap engaged in all sorts of drug dealing – for instance, discussing a prospective 2-pound fentanyl transaction with his confederate.

(Notably, two pounds of fentanyl contains approximately 450,000 lethal doses.)  Flores is a danger to the community.

Not only is Flores a danger to the community, he's also a serious risk of flight.  In late May 2022, during a second wiretap period, Flores was captured discussing his state court case in San Rafael.  Flores said that the judge wanted him incarcerated for 180 days, and that he would be deported because, Flores believed, the place (the court) was not a sanctuary place.  When asked if he would show up for court the following day, Flores answered no.  Flores said he was just going to move houses and that he was not going to turn himself in.  Flores also said he was going to "hustle" – in other words, deal more drugs – for two more months in order to make at least 200,000 or 300,000 bucks so that he could finish building his house in Honduras, and then he would take off for Honduras.  In a call that took place a couple of hours later, Flores said he was able to get his passport from the consulate.

Additionally, Flores's criminal and immigration history establishes that he's a repeat player who cannot be trusted to follow court orders.  For instance, in October 2021, he was arrested in San Rafael on various drug charges including possessing and transporting a drug for sale.  (During an intercepted call, Flores admitted he was arrested with 1 kilogram (in that San Rafael case).)  In addition, in March 2018, Flores was convicted of improper entry by an alien; he was then deported to Honduras in May 2018.  Just a few months later, in November 2018, Flores reentered the country.  He was caught, convicted, and again deported to Honduras.  Flores then returned *again* in September 2019, only to be arrested yet again.  He received 164 days on his supervised release violation and another 12 months imprisonment on an illegal reentry conviction.

This Court should detain Flores as both a danger to the community and risk of flight.

## II.    BACKGROUND

Flores is a drug dealer who sells predominantly fentanyl and methamphetamine.  Further, wiretap intercepts establish he is a professional motivated by money, not any addiction.

Flores entered federal law enforcement's radar earlier this year.  In particular, on February 26, 2022, at about 8:48 p.m., Flores spoke with an undercover agent about heroin ("chiva"), drug samples, and various colors of fentanyl (Reyes, Flores's fellow drug dealer, was also on the call).  The following is a preliminary transcription of the call:

| | |
|---|---|
| 1 | FLORES: Hey, we got like, like blue, yellow |
| 2 | [REYES in the background: green] |
| 3 | FLORES: Purple, pink, white. All the colors my buddy |
| 4 | [REYES in the background: Tell him so that we send them the yellow] |
| 5 | FLORES: We got a bunch of colors |
| 6 | UNDERCOVER: alright tell him I uh, I want a sample uh can he bring me a sample of all the |
| 7 | colors? |
| 8 | The following was also said: |
| 9 | UNDERCOVER: yea I'm going to meet him in Oakland like normal |
| 10 | FLORES: You know what I mean? Like… Because, I wanna explain to him, you know what |
| 11 | I mean? Like, like, what, what…samples you, you looking, you, you want. Like, what, what |
| 12 | colors. Like, like, you want the…all the colors we have? |
| 13 | UNDERCOVER: Yeah, yeah. I want, I wannna sample all the colors, so I could bring it to my |
| 14 | people |
| 15 | FLORES: Okay. Samples and, and, and what about the "chiva?" |
| 16 | UNDERCOVER: Yeah, that, that "chiva," too. The, the black "chiva" |
| 17 | FLORES: Okay. So, you going to… you… I have a question for you. I wanna explain to him, |
| 18 | you know what I mean? Like, you want the real "chiva," the strongest, you know, like, no |
| 19 | cutting, n-nothing? |
| 20 | UNDERCOVER: Yeah, yeah, no cut. I, I don't want the "chiva" cut. |

Later, on March 3, 2022, Flores sold the undercover two ounces of methamphetamine to the undercover for $500. The undercover asked Flores how much he would sell a pound of methamphetamine for and what Flores was selling ounces of fentanyl for. Complaint, ¶ 81. Flores said he had two types of fentanyl, and that he sells one type in San Francisco and another type that is high quality. *Id.* Flores said he would work on a price for fentanyl and methamphetamine and get back to the undercover. *Id.* Later that evening, Flores texted the undercover that he would sell a pound of methamphetamine for $2,500 and an ounce of fentanyl for $800. *Id.* at ¶ 82.

On March 24, 2022, about three weeks after the first controlled buy, Flores sold another four

ounces of methamphetamine and also two ounces of fentanyl to the undercover. *Id.* at ¶ 83. Leading up to the controlled purchase, Flores asked what colors of fentanyl the undercover wanted, and said he had yellow, green, pink, and rainbow. *Id.* at ¶ 86.

Following these transactions, the DEA obtained a wiretap order authorizing the interception of Flores's communications. For instance, on May 11, 2022, at about 13:13:39, Flores was captured on the wiretap discussing his five prior arrests and two arrests that came in quick succession, just 11 days apart:

| 05/11/2022 13:13:39 | 12 | TT4- Bayron FLORES | (720) 930-3471 | Incoming | FEDERAL PRISON LINE (JOEL) | (202) 499-3650 | Voice | 00:15:34.995 | Pertinent | | Synopsis or Summary Complete | Spanish |

MISAEL TO FLORES

This call is from a Federal Prison. You will not be charged for this call. This call is from ... MISAEL. This call will be recorded and subject to being monitored at any time. To accept this call, press 5. To block... You may start speaking now.

Parties greeted. MISAEL asked what FLORES was doing. FLORES said he (FLORES) was arranging some papers and found something when he (FLORES) was busted, released, and busted again 11 days later. MISAEL asked how many times FLORES had been caught and he (FLORES) said 5 times. MISAEL said FLORES should have gotten a break. MISAEL mentioned that not too long ago, a bunch of dudes were picked up by law enforcement... [thought not finished by Misael] CALL AUTO MINIMIZED.

FLORES said that there was that one day that he (FLORES) was delivering something (possibly narcotics) and he (FLORES) got busted. MISAEL acknowledged. FLORES said that just yesterday, he (FLORES) had called MISAEL'S sister. FLORES said he was sending some money to the family. FLORES said that he (FLORES) was late and did not get a chance (possibly to send MISAEL some money). FLORES said that he was going to send something to MISAEL yesterday and his fucking car broke down on the way. FLORES repeated that he (FLORES) had spoken to MISAEL'S sister yesterday to see if he (FLORES) could send him (MISAEL) 40 dollars.

During another call from the same day, Flores told a caller he had the "new rainbow" color (of fentanyl) and that it was "fire" as follows:

| 05/11/2022 16:46:15 | 19 | TT4- Bayron FLORES | (720) 930-3471 | Incoming | UM7673 | (707) 704-7673 | Voice | 00:01:45.999 | Pertinent | SYNOPSIS REVIEWED | Synopsis or Summary Reviewed | English |

UM7673 TO FLORES

UM7573 asked if FLORES would front him (UM7673) something (possibly narcotics) until Friday and he (UM7673) would give FLORES something extra (money). FLORES said it was cool and UM7673 did not have to give him (FLORES) any extra money and believed he (UM7673) would keep his word. UM7673 said he (UM7673) appreciated that and asked what colors FLORES had. FLORES said he (FLORES) had the "new rainbow" color (possibly narcotics) and that it (possibly narcotics) was fire. FLORES said he (FLORES) would let UM7673 have a half (possibly narcotics). UM7673 said that was perfect. FLORES said he (FLORES) was not losing anything as long as UM7673 was straight with him (FLORES). UM7673 thanked FLORES and he (FLORES) told him (UM7673) to call when he (UM7673) was in that area. FLORES told UM7673 to go by 81st and International. UM7673 said all right and would be there in an hour, an hour and a half. FLORES said all right. EOC

Flores's drug dealing continued throughout the wiretap period. For instance, on May 20, 2022, Flores discussed a drug transaction with a customer as Flores was *in court* (presumably state court):

DETENTION MOTION
3:22-mj-70740 MAG                                4

> Pertinent    984    (720) 930-3471   05/20/2022   16:27:50   00:02:56.998   Incoming   (650) 995-3928   NICK
>
> NICK to FLORES
>
> Parties greeted. NICK asked if that was $100 dollars worth. FLORES said it was a gram and 1.3. NICK said that was a .4, not even close to a gram. FLORES said he (FLORES) would call… [Thought not finished by FLORES] FLORES said he (FLORES) was almost at his (FLORES's) house and would tell him (FLORES cousin) to grab the stuff and said he (FLORES) would be at his (FLORES) house in 4 minutes. NICK said he (NICK) had to go to work and asked how long. FLORES said he (FLORES) would be at his (FLORES's) house in 4-5 minutes.
>
> FLORES asked if NICK was sure it was not even a… [Thought not finished by FLORES.] NICK said he (NICK) had never said that (complained) to him (FLORES) before. FLORES said he (FLORES) knew. NICK said he (NICK) could take a picture and it (possibly narcotics) was maybe a half gram. FLORES said it was okay and told NICK he (FLORES) was almost at his (FLORES's) house, so would tell him (FLORES cousin) to go grab and he (FLORES) would make sure it was like… [Thought not finished by FLORES]. FLORES asked NICK to give him (FLORES) 5 minutes. NICK said he (NICK) might need to leave, so asked FLORES how long because he (NICK) had work. FLORES said he (FLORES) was in court and [U/I]. NICK asked if FLORES was really 5 minutes away. FLORES said he (FLORES) was on the freeway. NICK said it was not even 1/2 a gram and he (NICK) had never mentioned anything like it to FLORES. FLORES said he (FLORES) would tell that motherfucker (FLORES cousin) to put like a gram. FLORES said he (FLORES) would tell him (FLORES's) cousin to bring something more. NICK asked if he (FLORES cousin) would bring it (possibly narcotics) right now or what should he (NICK) do. FLORES said he (FLORES) would tell him (FLORES cousin). NICK said alright. EOC

That same day (May 20), at about 7:07 p.m. (No. 990), Flores expressed concern about a customer who he thought might be a cop. Despite his concerns, Flores said he had to take risks in life – in other words, continue drug dealing – as follows:

> FLORES said he (FLORES) was scared. NANCY asked why. FLORES said a guy (third party) called him (FLORES) to order a "work" that was too much. FLORES said he (FLORES) [U/I] trust. NANCY asked if [U/I]. FLORES said he (third party) was very clean and he (FLORES) was eighty percent sure he (third party) was a cop. FLORES said he (FLORES) had to take the risks in life though. NANCY asked if FLORES had sold to him (third party) a couple of times. FLORES said he (FLORES) had already sold to him (third party) three times and left him (FLORES) with a good profit. FLORES said the guy (third party) asked for a pound of "feno" (possibly narcotics). NANCY asked of what. FLORES said 1 pound of that shit (possibly narcotics). NANCY asked if (FLORES) had never sold that (feno, possibly narcotics). FLORES said he (FLORES) has sold to him (third party) before, but 1 or 2 ounces. FLORES said he (third party) was asking for 36 (ounces). NANCY asked if ounces. FLORES said yes, which would make it 1 pound. NANCY said [U/I]. FLORES said he (third party) was asking for 2,000 pills and that pound [U/I]. FLORES said he (FLORES) could not hear NANCY. EOC

And during the same call, while discussing the possibility that police were following him, Flores talked about the particular dangers of fentanyl in California:

> FLORES said he (third party) always came with different cars like Mercedes, BMW… [Thought not finished by FLORES.] NANCY asked if it was a police. FLORES said he (FLORES) did not know. NANCY asked if he (third party) answered when FLORES called him (third party). FLORES said he (FLORES) could not back out right now and [U/I] [audio glitch]. NANCY said FLORES would lose more for that. FLORES said he (FLORES) had to keep risking it, because [U/I] [audio glitch]. NANCY asked FLORES what he (FLORES) meant. FLORES said he (FLORES) would have to move states. FLORES said the problem was here (California), because San Francisco was the only state where Fentanyl was the most dangerous [U/I] [audio glitch].

Furthermore, just about a week ago, Flores was captured discussing his escape plans. Essentially, he planned to ditch his state court appearance on various drug charges (he admitted he possessed one kilogram in connection with that case), deal drugs for about two more months so that he could obtain 200,000 or 300,000 more bucks and possibly up to half a million in order to complete the house he was having built in Honduras, and then take off and rejoin his family in Honduras. Flores revealed why he did not plan on going to jail; he would be deported back to Honduras. Flores also talked about how different Bay Area counties treated criminals differently, and how San Rafael (Marin County) was "tough." Flores repeated that he was not going to jail for six months. Flores even talked about how he told his attorney that he was not feeling well, and that he hoped he would be sent a link to

attend court by phone in order to get a new court day. A summary of the call, which took place at about 10:46 a.m., follows:

```
1765           (720) 930-3471   Pertinent     05/31/2022   10:46:58   00:42:33.007   Outgoing      (641) 793-9985   BOSS REVOLUTION
FLORES to NANCY (Per voice ID)
```
FLORES asked how NANCY was. NANCY said she (NANCY) was laying down. FLORES asked if NANCY was not feeling well. NANCY said yes. FLORES asked if NANCY's tooth was hurting. NANCY said uh-huh. FLORES told NANCY to go tell nurse that it (tooth) was not hurting anymore and to have that shit removed. Conversation continued about NANCY feeling pain and the anesthesia not working.

FLORES told NANCY he (FLORES) was going to court tomorrow. NANCY asked where. FLORES said over there (San Rafael court per later on the call). FLORES said they (attorney from San Rafael court) had called him (FLORES) just now. FLORES said he (FLORES) was getting screwed. NANCY said she (NANCY) thought it (court appointment) was not until June. FLORES said they (attorney from San Rafael court) told him (FLORES) that the judge wanted him (FLORES) to be incarcerated for 180 days. NANCY asked how many months 180 days was. FLORES said 6 months. NANCY said that was too much time. FLORES said yeah, and on top of that they (immigration) were going to deport him (FLORES) anyway. FLORES said he (attorney from San Rafael court) told him (FLORES) that if he (FLORES) went (to court), they (San Rafael court) were going to deport him (FLORES) for sure because at that place (court) they (San Rafael court) deported people, because it was not sanctuary there. NANCY asked what FLORES was going to do now. FLORES said he (FLORES) was just going to move out of the house and was going take care of himself (FLORES) immediately for 2 more months because he (FLORES) was almost done (building the house in Honduras). FLORES said he (FLORES) had bought most of the material for the house already. FLORES said he (FLORES) wanted to be able to buy the roof and the ceramic at the very least. FLORES said he (FLORES) was going to hustle and then leave in 2 months, but he (FLORES) was not going to turn himself (FLORES) in. NANCY asked if FLORES was not going to go (to court) tomorrow then. FLORES said no. NANCY asked if FLORES was just going to move houses. FLORES said yes, because he (FLORES) was not going to turn himself (FLORES) in. NANCY said six months [U/I], FLORES said no, he (FLORES) was better off moving out of the house and taking care of himself (FLORES) for 2 months to make at least 200 or 300 thousand bucks to buy materials to finish off the roof and to buy the ceramic and would fucking take off (to Honduras). NANCY said uh-hum.

FLORES said he (FLORES) was not an idiot to put time in (jail) and then get sent (deported) back (to Honduras). NANCY said uh-hum. FLORES said he (FLORES) was better off just taking care of himself (FLORES) for 2 more months, and take it easy. NANCY asked if FLORES was going to move houses today. FLORES said he (FLORES) was going to see, FLORES said he (FLORES) was going to wait right now, because he (FLORES) was told by the attorney that he (attorney) was going to look for a way to do ... [thought not finished by FLORES] FLORES said he (FLORES) told them (attorney and others) that he (FLORES) was not feeling well, and hopefully he (attorney) could send him (FLORES) the link to do it (court) by phone and get a new court day, like in a month from now. NANCY said to tell them (attorney/judge) that FLORES was not in good health. FLORES said he (FLORES) needed time because he (FLORES) did not have much more left to do over there (Honduras). FLORES said that house was almost done. NANCY asked if FLORES had almost bought everything. FLORES said yes, he (FLORES) had the most important things like the block, the rods, the cement and all of that. Social conversation continued about construction materials FLORES wanted to buy in advance (before leaving to Honduras). FLORES said they (FLORES and NANCY) were in no position of adding anything fancy to the house (in Honduras) anymore. Social conversation continued about buying ceramic and FLORES taking care of the doors and paint. NANCY said God was the one who decided what happened, FLORES said yeah. FLORES said he (FLORES) needed 2 more months, he (FLORES) would be able (capable) to make 1/2 a million in 2 months. NANCY asked if 9 millions, FLORES said 1/2 a million. FLORES said that (1/2 million) would be enough (money) to finish making the house, and would not have to touch any (of the money) that he (FLORES) had. FLORES said he (FLORES) wanted to use what he (FLORES) had for them (FLORES and NANCY). FLORES said he (FLORES) did not want to touch anything (possibly money in Honduras) and wanted to do everything from here (USA). Social conversation continued about the material FLORES already had and about the fence. NANCY asked what German was making, FLORES said he (German) was making the front [U/I]. NANCY said it was tough, and said it was in God's hands now. FLORES said he (FLORES) was fucked and thought they (FLORES and NANCY) would be together sooner than they (FLORES and NANCY) thought. NANCY said FLORES had to take car because [U/I]. FLORES said he (FLORES) was just going to move houses and take it easy. NANCY asked if FLORES thought he (FLORES) would not have any problems, FLORES said the only problem was that an arrest warrant would be issued to his (FLORES') name and would just have to wait. NANCY acknowledged.

NANCY asked about the people who were arrested constantly. FLORES said yes, but not in the county where he (FLORES) was (arrested). NANCY said that was true. FLORES said the county where he (FLORES) was taken in was tough. NANCY asked if it (FLORES' arrest) had not been there in Oakland (California). FLORES said no, it was over in San Rafael (California). NANCY asked if it (San Rafael county) was far from Oakland (California). FLORES said no and said there were bridges here (USA) and different counties were close to each other. NANCY asked if FLORES could not leave to Denver (Colorado). FLORES said no, there were more problems there (Denver, Colorado). FLORES said the problem was that if he (FLORES) got caught ... [thought not finished by FLORES] FLORES said he (FLORES) did not want to leave anywhere and explained that if he (FLORES) left and got arrested, he (FLORES) would be taken to the county where he (FLORES) had (the arrest warrant). NANCY acknowledged. FLORES said he (FLORES) did not plan on working legally (possibly in a legitimate job). NANCY said okay. FLORES said he (FLORES) would figure it out, and said the important thing was to take care of himself (FLORES). NANCY said yes. [Aside: Bayrito asked NANCY for a milkshake.]

NANCY asked if FLORES was scared, FLORES said no, because it was just a matter of him (FLORES) making a decision (of what to do). FLORES said he (FLORES) did not want (to leave) because the house (in Honduras) was already started. FLORES said he (FLORES) could easily buy a (airplane) ticket and fucking take off. FLORES said he (FLORES) was not going to go to jail for 6 months. NANCY said everything depended on the house (that was being built). Social conversation ensued about the house and FLORES having all the material ready. FLORES said he (FLORES) just wanted them (construction workers) to get more done. NANCY asked if German was the only one who was going to glue blocks or if Pedro as well. Social conversation continued about German needing a helper once he (German) glued the blocks and about Guato and Pedro being good workers. FLORES said he (FLORES) needed to do that (get materials) this week. FLORES said he (FLORES) wanted to buy what was needed, like the ceramic. FLORES said he (FLORES) wanted to invest in everything (all the material) he (FLORES) needed. [LEFT OFF AT 14:55, FAVI WORKING ON IT, WILL FINISH TOMORROW]

FLORES said he got arrested with 1 kilo (in San Rafael).

SF court at 2:00 PM and San Rafael court tomorrow.

In a second call that took place about two hours later, Flores discussed his appointment at the consulate and confirmed he had obtained his passport. Flores expressed his concern about going to jail and being deported and talked about converting his San Rafael court appearance into a Zoom appearance. A summary of this second call, which took place a couple of hours later at about 12:18 p.m., follows:

DETENTION MOTION                                        6
3:22-mj-70740 MAG

> 1773   (720) 930-3471   Pertinent   05/31/2022   12:18:00   00:09:05.001   Outgoing   (415) 364-8553   DABID
>
> FLORES to DABID
>
> Parties greeted. DABID asked how the appointment with the consulate went. FLORES said it (appointment) went well. DABID asked if FLORES was able to get his passport. FLORES said yes. DABID said that was good, and now he (FLORES) just needed to focus on the appointments he (FLORES) had pending a the hospital. FLORES said he (FLORES) went to the appointment already. DABID asked how it (appointment at the hospital) went. FLORES said good, and that he (FLORES) explained to them (hospital staff) that they (hospital staff) were giving him (FLORES) 870 pills and agreed to call back tomorrow to make an appointment with his primary doctor. DABID said that was good and he (FLORES) was making good progress. FLORES said yes.
>
> FLORES said he (FLORES) was calling her (DABID) to find out if he (FLORES) had court today or not. DABID said not today, but was scheduled to have cour on (June) 7th. DABID said that would be next Tuesday.
>
> FLORES said he (FLORES) wanted to talked to her (DABID) about something. DABID said yeah. FLORES said he (FLORES) had another case in San Rafael (California), so they (third party) called him (FLORES) today to tell him (FLORES) that he (FLORES) had court tomorrow over there (San Rafael) but he (FLORES) was going to do it (court) through Zoom. FLORES said he (FLORES) wanted to ask her (DABID) something because the court from over there (Sa Rafael, California) wanted him (FLORES) to accept a deal where he (FLORES) would spend time in jail, so he (FLORES) wanted to know if they (DABID and others) could help him (FLORES) with his (FLORES's) attorney to see if something could be done because they (San Rafael court) wanted him (FLORES) to do 120 days incarcerated. FLORES said the problem was that they (San Rafael court) wanted him (FLORES) to do no time and then deal with his (FLORES) immigration, but they (FLORES's attorney and others) told him (FLORES) they (immigration) could end up deporting him (FLORES). FLORES said he (FLORES) did not wanted that (deportation). DABID asked if the (San Rafael) court had assigned him (FLORES) an attorney. FLORES said yes, and that he (FLORES) had an attorney. DABID said in that case FLORES should talk to his (FLORES's) attorney about the subject, so they (attorney) could explain to him (FLORES) what the best option was. FLORES said that was what he (attorney) was saying though. DABID said she (DABID) could send a message to the attorney helping FLORES on this program, to see if she (attorney from the program) could be persuaded them (court), however it was possible that FLORES already had another attorney over there (San Rafael). FLORES said she (attorney from the program) had number for this attorney already.
>
> FLORES said the problem was that he (FLORES) did not want to show up to the court knowing that they (San Rafael court) could leave (arrest) him (FLORES there, because he (FLORES) was going to loose everything since he (FLORES) already knew they (San Rafael court) were going to deport him (FLORES). DABID aske if FLORES could do it (court appointment) through Zoom. FLORES said he (FLORES) was going to have the court (appointment) through Zoom. DABID told FLORES to talked to his (FLORES's) attorney and attend the court through Zoom to see what they (San Rafael court) had say. FLORES said yes, and that they (San Rafael court) told him to attend through Zoom, but the thing was they (San Rafael court) wanted him (FLORES) to sing papers saying he (FLORES) was going to spend time in jail. FLORES said then he (FLORES) was going to get deported, but he (FLORES) was there (U.S.A.) for his (FLORES) family and to help his (FLORES's) kids. DABID said it was best for FLORES to speak with his (FLORES's) attorney about this subject to see what they (FLRORES's attorney) could advice him (FLORES) on and on what was the best option for him (FLORES). DABID told FLORES to tell him (FLORES's attorney) what he (FLORES) was telling her (DABID) to see what his (FLORES's) attorney had to say. FLORES said yeah, and that he (FLORES) would first wait and see what the court had to say tomorrow. FLORES said his (FLORES's attorney) would be in court with him (FLORES) tomorrow, and then afterwards he (FLORES) was going to talked to him (FLORES's attorney) to see what was up because he (FLORES) did not wanted to get deported. DABID asked if he (FLORES) was going to mentioned that to him (FLORES's attorney) or if he (FLORES) rather have her (DABID) send him (FLORES's attorney) a message. FLORES said he (FLORES) would be grateful with the help. DABID said she (DABID) was also going to send a message to his (FLORES's) attorney from here to see what she (attorney from the program) had to say, but FLORES should talked to his (FLORES's) attorney from the court over there (San Rafael court) to get the best advice. DABID told FLORES to let him (FLORES's attorney at San Rafael court) know about the thoughts he (FLORES) was having and the worries he (FLORES) had. FLORES said yeah, and that he (FLORES) had already talked to him (FLORES's attorney at San Rafael court) and was told there was no way of helping him (FLORES). FLORES said he (FLORES) did not wanted to do the time and then get deported. FLORES said he (FLORES's attorney at San Rafael court) was going to (open) an immigration case on his (FLORES's) behalf, but he (FLORES) did not wanted to go to jail. DABID said it was best for FLORES t talked to them (FLORES's attorney at San Rafael court) about this subject. FLORES said yeah, and that it was all good. DABID asked if FLORES had court in Marin County. FLORES said yes. DABID said she (DABID) was going to send a message to his (FLORES's) attorney from here as well to see what she (attorney from the program) had to say. FLORES said okay. DABID told FLORES to stay in touch regularly. FLORES said okay.

Based on these intercepts, the DEA obtained a complaint against Flores and searched his residence. Following his arrest, which occurred last week, Flores admitted that the drugs found in a backpack – specifically, 534.8 gross grams of fentanyl and approximately 13 M30 pills – belonged to him. Another 37.1 grams of heroin (gross) was found on the TV stand in the bedroom, and Flores admitted that he normally keeps his drugs on the TV stand. Moreover, another 43.4 grams of heroin (gross) and 83.4 grams of fentanyl (gross) were found in a purple Lakers hoodie sweatshirt that law enforcement had previously seen Flores wearing. These quantities of fentanyl and heroin are distribution quantities, not personal use quantities.

Flores also said in his post-arrest interview that he was going to try to throw a bag full of drugs out the window; in fact, a law enforcement agent on scene saw Flores try to throw a bag out or get out of

the window himself, but upon seeing the agent, Flores decided against it. Last, Flores claimed in his interview that he works at a body shop and paints cars. But in the 10:46 a.m. intercepted call above, Flores said he did not plan on working legally. Moreover, in none of the intercepted calls did Flores mention any type of legitimate employment.

### III.  LEGAL STANDARD

Under the Bail Reform Act of 1984, as amended, the Court must detain a defendant pretrial without bail where "the judicial officer finds that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person in the community." 18 U.S.C. § 3142(e)(1). Detention is appropriate where a defendant is either a danger to the community or a flight risk; it is not necessary for the government to prove both. *United States v. Motamedi*, 767 F.2d 1403, 1406 (9th Cir. 1985). A finding that a defendant is a danger to the community must be supported by clear and convincing evidence, but a finding that a defendant is a flight risk need only be supported by a preponderance of the evidence. *Id.*

"[T]he Bail Reform Act mandates an individualized evaluation guided by the factors articulated in § 3142(g)." *United States v. Diaz-Hernandez*, 943 F.3d 1196, 1199 (9th Cir. 2019). Those factors are: (1) the nature and circumstances of the offense charged; (2) the weight of the evidence against the defendant; (3) the history and characteristics of the defendant, including the defendant's character, physical and mental condition, family and community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings, as well as whether the crime was committed while the defendant was on probation or parole; and (4) the nature and seriousness of the danger to any person or to the community that would be posed by the defendant's release. 18 U.S.C. § 3142(g); *United States v. Winsor*, 785 F.2d 755, 757 (9th Cir. 1986). Additionally, in this case there is a rebuttable presumption that no condition or combination of conditions will reasonably assure the appearance of the defendant and the safety of the community because the Court has already found that there is probable cause to believe that the defendant committed an offense for which the maximum term of imprisonment in the Controlled Substances Act is ten years' imprisonment or more. *See* 18 U.S.C. § 3142(e)(3)(A).

## IV. ARGUMENT

The defendant should be detained pretrial. First, the United States has established by a preponderance that the defendant is a risk of flight whose appearance cannot be reasonably assured by any conditions. Flores has been deported on multiple occasions and explained during intercepted calls (see above) his escape plan. Flores has no intention of going to jail.

Second, the United States has also established that Flores is a danger to the community. Despite multiple arrests – he had appearances scheduled in San Francisco and San Rafael as a result of those arrests – he continued to deal drugs. He continued to deal drugs even though he had concerns that one of his customers was an undercover law enforcement officer. For Flores, the risk was worth it; the reward was just too good for him to pass up. He even said he wanted to "hustle" just two more months in order to obtain 200,000 or 300,000 more bucks and possibly up to half a million. And, of course, Flores was not dealing just any drug; he was dealing fentanyl, which is especially lethal. In fact, just two milligrams of fentanyl,[1] depicted in the following picture, is lethal in most people:



See https://www.dea.gov/galleries/drug-images/fentanyl, last visited June 7, 2022

---

[1] See https://www.dea.gov/sites/default/files/2021-12/DEA-OPCK_FactSheet_December%202021.pdf, last visited June 7, 2022 (December 2021 publication stating that 2 mg of fentanyl is considered a deadly dose and that 4 out of 10 pills DEA tests contain a potentially lethal dose).

On March 24 alone, Flores sold two ounces of fentanyl – which is equiavlent to just under 57 grams, as there are 28.3495 grams in a single ounce – to the undercover agent. That means Flores sold 28,500 potentially lethal doses of fentanyl to the undercover agent (57,000 milligrams divided by two). Of course, as evidenced by the wiretap intercepts and the seizure of drugs on the date of his arrest, Flores sold many more lethal doses.

Fentanyl is truly a drug unlike any other. Just two milligrams – equivalent to just a few grains of salt – is deadly. It is no wonder why the nation's drug-related overdose and death epidemic continues to worsen. *See, e.g.*, https://www.ama-assn.org/system/files/issue-brief-increases-in-opioid-related-overdose.pdf, last visited June 7, 2022 ("The nation's drug overdose epidemic continues to change and become worse. The epidemic affects every state and now is driven by illicit fentanyl, fentanyl analogs, methamphetamine, and cocaine, often in combination or in adulterated forms. More than 107,000 deaths were reported in the United States between December 2020 to December 2021.").

This Court should detain Flores as both a danger to the community and serious risk of flight.

DATED: June 8, 2022

Respectfully submitted,

STEPHANIE M. HINDS
United States Attorney


_____/S/_____
RYAN REZAEI
Assistant United States Attorney